## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LKQ CORPORATION, and | ) | Case No.    1:21-cv-05854 |
| KEYSTONE AUTOMOTIVE | ) | |
| INDUSTRIES, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| GENERAL MOTORS COMPANY, | ) | |
| GM GLOBAL TECHNOLOGY | ) | |
| OPERATIONS, LLC, and | ) | |
| GENERAL MOTORS LLC | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT AND INVALIDITY

Plaintiffs LKQ Corporation and Keystone Automotive Industries, Inc. ("LKQ" or "Plaintiffs"), by their attorneys, Irwin IP LLC, seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 against Defendants General Motors Company ("GMC"), GM Global Technology Operations, LLC ("GM Global"), and General Motors LLC ("GM LLC") (collectively "GM" or "Defendants"), and allege as follows:

### PARTIES

1.    Plaintiff LKQ Corporation is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661. LKQ Corporation, by and through its subsidiaries, imports and sells, among other items, commercially successful automotive replacement and repair parts throughout the United States and in this District.

2.    Plaintiff Keystone Automotive Industries, Inc. ("Keystone") is a corporation

organized and existing under the laws of the State of Delaware with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661. Keystone is a subsidiary of LKQ Corporation and distributes aftermarket automotive replacement parts throughout the United States and in this District.

3.      Defendant GMC is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 300 Renaissance Ctr., Detroit, MI 48243. GMC manufactures and distributes vehicles and vehicle parts throughout the United States and in this District.

4.      Defendant GM Global is a subsidiary of General Motors Company, organized and existing under the laws of the State of Delaware with its offices located at 300 Renaissance Ctr., Detroit, MI, 48243. On information and belief, Defendant GM Global conducts research and development for GM LLC and/or parent GMC. GM Global is the assignee for the design patents at issue in this proceeding.

5.      Defendant GM LLC is, on information and belief, a subsidiary of General Motors Company, organized and existing under the laws of the State of Delaware with its offices located at 300 Renaissance Ctr., Detroit, MI, 48243. On information and belief, Defendant GM LLC conducts at least some of the operations of parent GMC.

## NATURE OF THE ACTION

6.      This is a declaratory judgment action seeking a determination that LKQ does not infringe U.S. Patent Nos. D818,406 (the "'406 Patent") and D828,256 (the "'256 Patent"); and further that the '406 Patent and '256 Patent are invalid as anticipated or obvious in light of the prior art, and purport to cover unpatentable subject matter. Collectively, the '406 Patent and the '256 Patent are referred to hereinafter as the GM Design Patents At Issue.

2

7.     This action arises from, on information and belief, affirmative measures taken by GM to interfere with LKQ's business operations by asserting that vehicle parts distributed by LKQ infringe the GM Design Patents At Issue, despite the fact that the '406 Patent and '256 Patent are (a) not infringed by LKQ, and (b) the GM Design Patents At Issue are invalid in light of the prior art and are drawn to unpatentable subject matter.

## HISTORICAL CONTEXT

8.     The automotive "aftermarket" industry generally consists of the market for replacement parts, accessories, and services for repairing or replacing the "original equipment" included in an automobile when it was first sold by the original equipment manufacturer ("OEM"). Aftermarket replacement parts are newly manufactured parts designed to replace damaged or worn original equipment parts in order to return the vehicle to its original condition as the vast majority of people seeking to repair their vehicle desire to return it close to its original condition.

9.     The automotive aftermarket industry, including that aspect of the industry consisting of replacement parts made and offered by third parties unaffiliated with the OEM to replace damaged or worn original equipment parts, is almost as old as the automobile itself and has served automobile owners as a crucial source for replacement parts for over a century.  On information and belief, the modern automotive aftermarket industry traces its origins to the formation of the Motor and Accessory Manufacturers Association in 1904, four years *before* the General Motors Company was founded, and has been furnishing essential parts and services to automobile owners across America ever since.  On information and belief, the United States' automotive aftermarket industry is now worth over $400 billion in revenue and employs 4.7 million people.

10.     Throughout its history, the aftermarket industry has enabled American automobile

3

owners to fully realize the value of their automotive investments by providing access to critical and affordable replacement parts. Due to the substantial value of any given automobile as a whole, an automobile can—and would be expected to—survive the lifespan of many of its constituent components, thus necessitating replacement of those parts that wear out or are damaged in order to realize the full value of the automobile as a whole. However, each automobile model is manufactured differently, and a part built for a given manufacturer's automobiles, would typically not fit another automobile model from the same manufacturer, much less those built by a different manufacturer. Thus, in the absence of aftermarket replacement parts, there would only be a single source for replacement parts for a given automobile model: the original equipment manufacturer, rendering each vehicle model a miniature monopoly market unto itself. With no competition to exert downward pressure on prices and owners locked in by their initial purchases, automakers would be free to charge whatever price would maximize their own profits. Vehicle owners would be forced to either pay the OEM's price, extract and reuse parts from scrapped automobiles of the same model if such parts are available in acceptable condition (a different proposition than new aftermarket parts), make do with mismatched replacement parts (which would have to be forced to fit via extensive and costly modification and unacceptable in any conceivable marketplace), or do without entirely, depreciating the value and utility of their substantial investment in the vehicle. By providing automobile owners with a non-OEM source of replacement parts for their automobiles, the aftermarket industry has historically injected crucial competition into what would otherwise be a captive and monopolized market, exerting downward pressure on prices and forcing OEMs to offer replacement parts for at least somewhat reasonable prices. Throughout substantially the entirety of automotive history, the aftermarket industry has provided not only the grease that keeps the gears smoothly turning, but often the gears as well.

4

11.     Throughout automotive history, aftermarket industry competition in the replacement parts market was the norm, and OEM exclusivity the exception, maximizing the choices available to consumers.

12.     In the mid-to-late 2000s, automotive manufacturers began to zero in on design patents as an avenue not only for protecting their whole vehicle designs from competing automakers (a legitimate use of such intellectual property), but for monopolizing the replacement parts market for their vehicles by obtaining design patents for individual exterior parts.  OEMs then brought these patents to bear against the aftermarket industry via what Congresswoman Zoe Lofgren described during a March 22, 2010, House Judiciary Committee hearing as, "creative enforcement" of that intellectual property.  Design Patents and Auto Replacement Parts, Hearing Before the H. Comm. on the Judiciary, 111th Cong. (2010).  Throughout this effort, the OEMs sought to brand this dispute—a bid to seize monopoly revenue—in misleading moralistic terms.  Specifically, as GM has done here, OEMs began describing the venerable aftermarket replacement parts industry participants, which had for a century supported their customers and breathed value into their products, as "copycats" and "pirates" despite the inherent absurdity, in context, of such a characterization (a dissonance noted by the House Judiciary Committee at the time).  In response to this OEM monopolistic effort, LKQ obtained license agreements from those OEMs seeking to enforce their patents.

13.     When other automakers first commenced enforcing their design patents against aftermarket providers of replacement parts, General Motors set out to expand its own design patent portfolio, applying for patents covering an ever-increasing number of its vehicles' exterior body panels in an effort to exclude the automotive aftermarket industry.  As it did with other OEMs, LKQ entered into a design patent license with GM.  After GM entered into a design patent license

agreement with LKQ, GM substantially accelerated its efforts to obtain design patents. It has only further accelerated since, to the extent that GM has now obtained an unprecedented number of design patents, including almost 600 patents issued since January of 2018, most of which cover individual exterior body parts and components.

14.     Fueled by this recent glut of design patents, the century-long paradigm of aftermarket industry access has abruptly inverted: for new GM vehicles, competition and consumer choice is now the exception for replacement parts, and OEM-exclusivity is the rule. Although GM's emotionally charged rhetoric casts this state of affairs as the norm, that is revisionist at best; GM's recent activities are an aberration from the norm, statistically, economically, and morally. This remarkable deviation from trend appears to have nothing do with quality control, and even less to do with safeguarding the incentive to develop innovative automobile designs; progress and innovation in the art of automotive design was alive and well in the century preceding 2009. GM's remarkable deviation from the trend is driven by the desire for revenue and to better capitalize on its captive market.

15.     Tellingly, GM's runaway patent acquisition practices clamp down not on derivative designs of its vehicle, much less "pirates" or "copycats," but on aftermarket industry competition in the replacement parts market. These anticompetitive efforts run in lockstep with GM's activities in other regimes, such as its recent trend towards stamping or incorporating its purported trademarks into the molds of its automobile grilles (once again, an effort to exclude the aftermarket industry from providing correct replacement parts without obtaining GM's permission to compete and paying a licensing fee). GM's goal is to lock GM vehicle owners into purchasing only those replacement parts GM allows them to use for the fifteen year term of GM's design patents, and indefinitely for parts having GM trademarks molded into them, sharply limiting the vehicle

owners' choices regarding whether and how to repair and maintain their automotive investments and depriving such vehicle owners of the potential value the aftermarket industry could provide them and their vehicles.

16.     By thus capturing the market, GM opens the door to exact ever-increasing premiums from their customers after locking them in with the initial sale, elevating GM's profits at the expense of consumers by increasing the costs of maintaining GM vehicles, increasing insurance costs, and increasing the rate at which GM vehicles would be declared total losses upon suffering collision damage that would otherwise be reparable.  All of these harms flow from GM's invalid application of design patents: as shown and alleged herein, GM has asserted patents that are invalid over the prior art and has stretched them well beyond their appropriate scope.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action and the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and the Patent Act of the United States, 35 U.S.C. § 101, *et seq.*

18.     This Court has personal jurisdiction over Defendants because, on information and belief, Defendants have continuous and systematic contacts with the state of Illinois and this Judicial District, have affirmatively directed infringement accusations at LKQ in this Judicial District, pursued such claims, and communicated such accusations to third parties in the Judicial District, such that Defendants' submission to personal jurisdiction would be fair and reasonable.

19.     Venue against Defendants is proper because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and Defendants are subject to personal jurisdiction in this Judicial district.  28 U.S.C. § 1391(b)(2) and (3).

## STANDING

20.     For many decades, LKQ and its predecessors, and others in a vast aftermarket parts industry, have been importing and offering for sale replacement automotive parts including grilles, fenders, bumpers, and more.  LKQ's business model in the United States automotive repair parts market is to be a comprehensive source of all automotive body repair parts for its customers.  Thus, its general practice is and has been to offer nearly every, if not every, automotive body repair part for virtually every mainstream vehicle model available unless doing so would be in violation of law (such as if a part were covered by a valid and unlicensed patent).  LKQ has infrastructure and business agreements in place that enable it to obtain and sell virtually all automotive body repair parts for virtually all mainstream GM vehicle models, and but for the existence of GM's design patents, LKQ is ready, willing, able to, and would do so for essentially all such vehicles' parts.

21.     LKQ products are of a consistently high quality.  Due to its long-standing presence in the aftermarket industry and its reputation for quality, LKQ has become a national leader among replacement part providers.

22.     GM sent correspondence to a third party making baseless allegations that certain automotive parts sold by LKQ and listed on the third party's vehicle part platform—Certified Collateral Corporation's ("CCC") platform—infringed certain GM design patents.

23.     Specifically, on March 1, 2019, GM's Counsel, Angela Caligiuri, sent a letter to CCC identifying certain replacement parts it alleged infringed approximately 250 different GM design patents, including parts sold by LKQ.  GM specifically noted that U.S. Design Patent Nos. D818,406 and D828,256 were not licensed to LKQ.  GM requested that the identified parts be removed from CCC's software platform.  *See* Exhibit 1 ("March 2019 GM Letter").  And GM has

sent virtually identical letters to the other major parts platforms as well, in an effort to keep LKQ's products out of the market.

24.     At the time this letter was sent, CCC maintained a database relating to all or substantially all GM OEM part numbers for which corresponding LKQ aftermarket replacement parts were available, including the specific part numbers for the corresponding LKQ parts.  On information and belief, GM was aware that CCC would be able to relate GM part numbers with any corresponding LKQ part numbers.  Thus, on information and belief, by indicating that LKQ was not authorized to manufacture parts corresponding to identified GM part numbers, GM knowingly and intentionally alleged to CCC that the LKQ part numbers CCC knew to correspond to the enumerated GM part numbers infringed GM's correspondingly identified design patents.  Indeed, it was GM's intention, through its threats to CCC and the other parts platform, to enforce its patents against LKQ without the need for litigation and without the need to subject its patents to the scrutiny they deserve.

25.     Thereafter, in December of 2019, GM provided a PowerPoint presentation to CCC in furtherance of its efforts to keep LKQ's products out of the market.

26.     On March 4, 2020, CCC sent a letter to LKQ requesting that LKQ remove certain parts allegedly covered by the GM Design Patents At Issue from CCC's platform.  *See* Exhibit 2 ("March 2020 CCC Letter").  Specifically, CCC directed LKQ to "provide specifics that can be shared with GM or contact General Motors directly."  *Id.* at 1.

27.     On information and belief, it was GM who caused and/or directed CCC to request LKQ remove a number of products.

28.     LKQ does not infringe the '406 Patent or the '256 Patent.  Further, the '406 Patent and the '256 Patent are invalid as anticipated or obvious over the prior art, and purport to cover

unpatentable subject matter. In addition, on information and belief, the '406 Patent and the '256 Patent are likely invalid based on the on-sale bar and based on the public disclosure of the designs claimed by the '406 Patent and the '256 Patent more than a year before the applications that led to those patents were filed.

29.     As explained in greater detail below, LKQ has taken substantial steps towards making available the parts GM alleges to infringe its design patents. In summary, LKQ and the vendors and suppliers comprising its extensive supply chain, have finalized designs for such parts, developed and constructed tooling enabling the manufacture of those parts, and commenced mass-manufacture of such parts for sale in foreign markets. Moreover, LKQ's business model in the aftermarket replacement parts market is to provide nearly every replacement part for every mainstream vehicle model, and it has developed a supply chain comprising dozens of vendors and tens of thousands of employees tasked with realizing that goal and bringing that business plan to fruition.

30.     LKQ intends to sell parts that it believes in good faith not to infringe any valid GM patent, such as those parts implicated by this complaint. LKQ has initiated this action in furtherance of its intent to sell the implicated parts in the United States, and will do so if it prevails.

31.     By virtue of the foregoing, a substantial controversy exists between the parties that is of sufficient immediacy and concreteness to warrant declaratory relief.

## GENERAL ALLEGATIONS

32.     The March 2019 CCC Letter identified a number of automotive parts on the CCC software platform, which allegedly correspond to the following GM design patents:

| GM Part Number | GM Design Patent | LKQ Part Number |
|---|---|---|
| GM84314965 | D818406 | GM1240409 |
| GM84314966 | D818406 | GM1241409 |
| GM84496744 | D828256 | GM1240413 |
| GM84496745 | D828256 | GM1241413 |

33.     Images of the LKQ parts that correspond to the above-listed LKQ part numbers are set forth below.  Each of the below-depicted parts is ready to be sold by LKQ and was asserted by GM, directly or indirectly, to infringe a GM design patent.  Each of the LKQ parts is compared in the table below with the correspondingly referenced GM Design Patent At Issue:

34.     All of the GM Design Patents At Issue were expressly alleged to cover a part that LKQ is ready to sell and a case and controversy exists as to each of them.

35.     LKQ has already taken substantial steps towards offering each of these parts in the United States, and upon a successful resolution of this action, if not sooner, LKQ intends to promptly offer for sale within the United States each of the parts it does not already offer for sale.

36.     Each of the GM Design Patents At Issue is assigned to GM Global Technology Operations, LLC.

**NON-INFRINGMENT ALLEGATIONS – THE '406 PATENT**

37.     The '406 Patent was filed on October 14, 2016 and issued on May 22, 2018.  *See* Exhibit 3.

38.     The '406 Patent claims "[t]he ornamental design for a vehicle front fender, as shown and described."  *Id*.

39.     The '406 patent claims only the right-sided fender.

40.     The below comparison illustrates the alleged infringing parts compared to the alleged GM design patent:

11



| LKQ Part Image | GM Design Patent |
|---|---|
| LKQ Part # GM1240409 | FIG. 1<br><br>*Id*., FIG. 1. |
| LKQ Part # GM1241409 | FIG. 1<br><br>**Id.** |

41.　　LKQ does not infringe GM's '406 Patent because an ordinary observer would not be confused into thinking that the design of the LKQ parts and the design covered by the '406 Patent are substantially similar.

42.　　At a minimum, and by way of example, the parts produced by LKQ have a different design line underneath the line that extends from the headlight:

| LKQ Part Image | GM Design Patent |
|---|---|
| | |



43.     Further, at a minimum, and by way of example, the LKQ Part # GM1240409 does not infringe the '406 Patent because the '406 Patent does not claim the left-sided fender:

| LKQ Part Image | GM Design Patent |
|---|---|
| | |



44. Thus, LKQ does not infringe the '406 Patent.

### **NON-INFRINGEMENT ALLEGATIONS – THE '256 PATENT**

45.     The '256 Patent was filed on June 29, 2017 and issued on September 11, 2018.  *See* Exhibit 4.

13

46.     The '256 Patent claims "[t]he ornamental design for a vehicle fender, as shown and described."

47.     The below comparison illustrates the alleged infringing part compared to the alleged GM design patent:



| LKQ Part Image | GM Design Patent |
| --- | --- |
| LKQ Part # GM1240413 | *FIG - 1*<br><br>*Id.*, FIG. 1. |
| LKQ Part # GM1241413 | *FIG - 1*<br><br>*Id.* |

48.     LKQ does not infringe GM's '256 Patent because an ordinary observer would not be confused into thinking that the design of the LKQ parts and the design covered by the '256 Patent are substantially similar.

49.     At a minimum, and by way of example, the part produced by LKQ does not have an extra crease claimed by the '256 Patent. Further, at a minimum, and by way of example, the design line around the wheel arch does not terminate at around the mid-point in the LKQ part, unlike in the '256 Patent. Both of these exemplary differences are highlighted below:



| LKQ Part Image | GM Design Patent |
|---|---|
| LKQ Part # GM1240413 | FIG - 1<br>*Id.*, FIG. 1. |

50. Thus, LKQ does not infringe the '256 Patent

**INVALIDITY ALLEGATIONS – THE '406 PATENT**

51.     The '406 Patent is invalid, at a minimum, as obvious over the prior art.

52.     At a minimum, and by way of example, the '406 Patent is obvious over the 2016 Mitsubishi Pajero Sport in light of the 2015 Toyota Tundra.

53.     The 2016 Mitsubishi Pajero Sport's fender design is basically the same as the claimed design of the '406 Patent.  The below chart compares exemplary images of the 2016 Mitsubishi Pajero Sport's fender to the claimed design of the '406 Patent:

| '406 PATENT | 2016 MITSUBISHI PAJERO SPORT'S FENDER |
|---|---|
|  Ex. 3, FIG. 1 | Ex. 5 at 5 |

54.     The 2016 Mitsubishi Pajero Sport was publicly available, sold, and purchased by consumers and images of the 2016 Mitsubishi Pajero Sport were publicly available, at least, as early as 2016, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

55.     Any difference between the '406 Patent and the 2016 Mitsubishi Pajero Sport's fender is suggested by the secondary reference, the 2015 Toyota Tundra.  *See* Exhibit 6 at 1.

16

56.     The appearance of the 2016 Mitsubishi Pajero Sport's fender is so related to the 2015 Toyota Tundra's fender that the appearance of features in one would suggest the application to the other:

| **2016 MITSUBISHI PAJERO SPORT'S FENDER** | **2015 TOYOTA TUNDRA'S FENDER** |
|---|---|



Ex. 5 AT 5

Ex. 6 AT 1

57.     The fender design of the 2016 Mitsubishi Pajero Sport has a similar overall shape as the fender design of the 2015 Toyota Tundra.

58.     The 2015 Toyota Tundra was publicly available, sold, and purchased by consumers and images of the 2015 Toyota Tundra were publicly available, at least, as early as 2015, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

17

59.     The features of the fender design of the 2016 Mitsubishi Pajero Sport combined with the features of the fender design of the 2015 Toyota Tundra would create a design with substantially the same overall visual appearance as the '406 Patent.

60.     Given the relatedness of the two designs, an ordinary designer would have been motivated to combine the fender design of the 2016 Mitsubishi Pajero Sport with the fender design of the 2015 Toyota Tundra to arrive at a design that is substantially the same as the claimed design of the '406 Patent.

61.     Thus, the '406 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '256 PATENT

62.     The '256 Patent is invalid, at a minimum, as obvious over the prior art.

63.     At a minimum, and by way of example, the '256 Patent is obvious over the 2015 Chevrolet Colorado in light of the design claimed by the D614,100 patent.

64.     The 2015 Chevrolet Colorado's fender design is basically the same as the claimed design of the '256 Patent.  The below chart compares exemplary images of the 2015 Chevrolet Colorado's fender to the claimed design of the '256 Patent:

| THE '256 PATENT | 2015 CHEVROLET COLORADO'S FENDER |
|---|---|
|  FIG - 1<br><br>Ex. 4, FIG 1 | Ex. 7 |

65.     The 2015 Chevrolet Colorado was publicly available, sold, and purchased by consumers and images of the 2015 Chevrolet Colorado were publicly available, at least, as early as 2015, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

66.     Any difference between the '256 Patent and the fender of 2015 Chevrolet Colorado is suggested by the secondary reference, the D614,100 patent. *See* Exhibit 8.

67.     The appearance of the design claimed by the D614,100 patent is so related to the 2015 Chevrolet Colorado's fender that the appearance of features in one would suggest the application to the other:

| 2015 CHEVROLET COLORADO'S FENDER | D614,100 |
|---|---|
|  Ex. 7 | Figure 1<br>Ex. 8, FIG. 1 |

68.     The design of the 2015 Chevrolet Colorado's fender has a similar overall shape as the design claimed by the D614,100 patent.

69.     The priority date of the D614,100 patent is April 3, 2008, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

70.     The features of the 2015 Chevrolet Colorado's fender combined with the claimed design of the D614,100 patent would create a design with substantially the same overall visual appearance as the '256 Patent.

71.     Given the relatedness of the two designs, an ordinary designer would have been motivated to combine the fender design of the 2015 Chevrolet Colorado with the design claimed by the D614,100 patent to arrive at a design that is substantially the same as the claimed design of the '256 Patent.

72. Thus, the '256 Patent is invalid, at a minimum, as obvious.

### COUNT I – NON-INFRINGEMENT OF THE '406 PATENT

73. LKQ realleges and incorporates Paragraphs 1–72 as if fully set forth herein.

74. LKQ does not infringe the '406 Patent because the allegedly infringing LKQ parts are not within the scope of and do not infringe the claim of the '406 Patent.

75. As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '406 Patent.

### COUNT II – NON-INFRINGEMENT OF THE '256 PATENT

76. LKQ realleges and incorporates Paragraphs 1–75 as if fully set forth herein.

77. LKQ does not infringe the '256 Patent because the allegedly infringing LKQ parts are not within the scope of and do not infringe the claim of the '256 Patent.

78. As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '256 Patent.

### COUNT III – INVALIDITY OF THE '406 PATENT

79. LKQ realleges and incorporates Paragraphs 1–78 as if fully set forth herein.

80. The claim of the '406 Patent is invalid, at a minimum, as obvious over the prior art.

81. The claim of the '406 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

82. As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '406 Patent is invalid.

## COUNT IV – INVALIDITY OF THE '256 PATENT

83.     LKQ realleges and incorporates Paragraphs 1–82 as if fully set forth herein.

84.     The claim of the '256 Patent is invalid, at a minimum, as obvious over the prior art.

85.     The claim of the '256 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

86.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '256 Patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, LKQ prays for:

a.   A declaration that LKQ has not infringed and is not infringing, directly or indirectly, the claim of the '406 Patent and '256 Patent;

b.   A declaration that the single claim of the '406 Patent and '256 Patent is invalid;

c.   An order that GM and each of its officers, employees, agents, attorneys, and any persons in active concert or participation with them are restrained and enjoined from further prosecuting or instituting any action against LKQ or the purchasers of LKQ's products claiming that the alleged patents are infringed or from representing that LKQ's products or their use on networks operated by purchasers of those products infringe the alleged patents;

d.   A declaration that this is an exceptional case under 35 U.S.C § 285;

e.   An award to LKQ of its costs and attorneys' fees;

f.   Such other relief as this Court or a jury may deem proper and just under the circumstances.

## **JURY DEMAND**

LKQ demands a trial by jury on all issues so triable.


Dated: November 2, 2021                    Respectfully submitted,


                                           */s/ Barry F. Irwin, P.C.*
                                           Barry F. Irwin, P.C.
                                           Michael P. Bregenzer
                                           Robyn Bowland
                                           Nick Wheeler
                                           **IRWIN IP LLC**
                                           180 N. Wacker Drive
                                           Suite 400
                                           Chicago, IL  60606
                                           (312) 667-6080
                                           birwin@irwinip.com
                                           mbregenzer@irwinip.com
                                           rbowland@irwinip.com
                                           nwheeler@irwinip.com

                                           *Attorneys for Plaintiffs LKQ Corporation &*
                                           *Keystone Automotive Industries*