## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

LKQ CORPORATION, and )    Case No. 1:21−cv−05854
KEYSTONE AUTOMOTIVE )
INDUSTRIES, INC. )
 )
     Plaintiffs, )
 )
    v. )    **JURY TRIAL DEMANDED**
 )
 )
GENERAL MOTORS COMPANY, )
GM GLOBAL TECHNOLOGY )
OPERATIONS, LLC, and )
GENERAL MOTORS LLC )
 )
     Defendants. )

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT AND INVALIDITY

Plaintiffs LKQ Corporation and Keystone Automotive Industries, Inc. ("LKQ" or "Plaintiffs"), by their attorneys, Irwin IP LLC, seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 against Defendants General Motors Company ("GMC"), GM Global Technology Operations, LLC ("GM Global"), and General Motors LLC ("GM LLC") (collectively "GM" or "Defendants"), and allege as follows:

### PARTIES

1.    Plaintiff LKQ Corporation is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661. LKQ Corporation, by and through its subsidiaries, imports and sells, among other items, commercially successful automotive replacement and repair parts throughout the United States and in this District.

2.     Plaintiff Keystone Automotive Industries, Inc. ("Keystone") is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 500 W. Madison Street, Suite 2800, Chicago, Illinois 60661.  Keystone is a subsidiary of LKQ Corporation and distributes aftermarket automotive replacement parts throughout the United States and in this District.

3.     Defendant GMC is a corporation organized and existing under the laws of the State of Delaware with its corporate office located at 300 Renaissance Ctr., Detroit, MI 48243.  GMC manufactures and distributes vehicles and vehicle parts throughout the United States and in this District.

4.     Defendant GM Global is a subsidiary of General Motors Company, organized and existing under the laws of the State of Delaware with its offices located at 300 Renaissance Ctr., Detroit, MI, 48243.  On information and belief, Defendant GM Global conducts research and development for GM LLC and/or parent GMC.  GM Global is the assignee for the design patents at issue in this proceeding.

5.     Defendant GM LLC is, on information and belief, a subsidiary of General Motors Company, organized and existing under the laws of the State of Delaware with its offices located at 300 Renaissance Ctr., Detroit, MI, 48243.  On information and belief, Defendant GM LLC conducts at least some of the operations of parent GMC.

### NATURE OF THE ACTION

6.     This is a declaratory judgment action seeking a determination that LKQ does not infringe U.S. Patent Nos. D818,406 (the "'406 Patent") and D828,256 (the "'256 Patent"); and further that the '406 Patent and '256 Patent are invalid as anticipated or obvious in light of the prior art, and purport to cover unpatentable subject matter.  Collectively, the '406 Patent and the

'256 Patent are referred to hereinafter as the GM Design Patents At Issue.

7.    This action arises from, on information and belief and among other things, affirmative measures taken by GM to interfere with LKQ's business operations by asserting that vehicle parts distributed by LKQ infringe the GM Design Patents At Issue, despite the fact that the '406 Patent and '256 Patent are (a) not infringed by LKQ, and (b) the GM Design Patents At Issue are invalid in light of the prior art and are drawn to unpatentable subject matter.

**HISTORICAL CONTEXT**

8.    The automotive "aftermarket" industry generally consists of the market for replacement parts, accessories, and services for repairing or replacing the "original equipment" included in an automobile when it was first sold by the original equipment manufacturer ("OEM"). Aftermarket replacement parts are newly manufactured parts designed to replace damaged or worn original equipment parts in order to return the vehicle to its original condition as the vast majority of people seeking to repair their vehicle desire to return it close to its original condition.

9.    The automotive aftermarket industry, including that aspect of the industry consisting of replacement parts made and offered by third parties unaffiliated with the OEM to replace damaged or worn original equipment parts, is almost as old as the automobile itself and has served automobile owners as a crucial source for replacement parts for over a century.  On information and belief, the modern automotive aftermarket industry traces its origins to the formation of the Motor and Accessory Manufacturers Association in 1904, four years *before* the General Motors Company was founded, and has been furnishing essential parts and services to automobile owners across America ever since.  On information and belief, the United States' automotive aftermarket industry is now worth over $400 billion in revenue and employs 4.7 million people.

3

10.     Throughout its history, the aftermarket industry has enabled American automobile owners to fully realize the value of their automotive investments by providing access to critical and affordable replacement parts.   Due to the substantial value of any given automobile as a whole, an automobile can—and would be expected to—survive the lifespan of many of its constituent components, thus necessitating replacement of those parts that wear out or are damaged in order to realize the full value of the automobile as a whole.   However, each automobile model is manufactured differently, and a part built for a given manufacturer's automobiles, would typically not fit another automobile model from the same manufacturer, much less those built by a different manufacturer.   Thus, in the absence of aftermarket replacement parts, there would only be a single source for replacement parts for a given automobile model: the original equipment manufacturer, rendering each vehicle model a miniature monopoly market unto itself.   With no competition to exert downward pressure on prices and owners locked in by their initial purchases, automakers would be free to charge whatever price would maximize their own profits.   Vehicle owners would be forced to either pay the OEM's price, extract and reuse parts from scrapped automobiles of the same model if such parts are available in acceptable condition (a different proposition than new aftermarket parts), make do with mismatched replacement parts (which would have to be forced to fit via extensive and costly modification and unacceptable in any conceivable marketplace), or do without entirely, depreciating the value and utility of their substantial investment in the vehicle. By providing automobile owners with a non-OEM source of replacement parts for their automobiles, the aftermarket industry has historically injected crucial competition into what would otherwise be a captive and monopolized market, exerting downward pressure on prices and forcing OEMs to offer replacement parts for at least somewhat reasonable prices.   Throughout substantially the entirety of automotive history, the aftermarket industry has provided not only the

4

grease that keeps the gears smoothly turning, but often the gears as well.

11.     Throughout automotive history, aftermarket industry competition in the replacement parts market was the norm, and OEM exclusivity the exception, maximizing the choices available to consumers.

12.     In the mid-to-late 2000s, automotive manufacturers began to zero in on design patents as an avenue not only for protecting their whole vehicle designs from competing automakers (a legitimate use of such intellectual property), but for monopolizing the replacement parts market for their vehicles by obtaining design patents for individual exterior parts.  OEMs then brought these patents to bear against the aftermarket industry via what Congresswoman Zoe Lofgren described during a March 22, 2010, House Judiciary Committee hearing as, "creative enforcement" of that intellectual property.  Design Patents and Auto Replacement Parts, Hearing Before the H. Comm. on the Judiciary, 111th Cong. (2010).  Throughout this effort, the OEMs sought to brand this dispute—a bid to seize monopoly revenue—in misleading moralistic terms.  Specifically, as GM has done, OEMs began describing the venerable aftermarket replacement parts industry participants, which had for a century supported their customers and breathed value into their products, as "copycats" and "pirates" despite the inherent absurdity, in context, of such a characterization (a dissonance noted by the House Judiciary Committee at the time).  In response to this OEM monopolistic effort, LKQ obtained license agreements from those OEMs seeking to enforce their patents.

13.     When other automakers first commenced enforcing their design patents against aftermarket providers of replacement parts, General Motors set out to expand its own design patent portfolio, applying for patents covering an ever-increasing number of its vehicles' exterior body panels in an effort to exclude the automotive aftermarket industry.  As it did with other OEMs,

LKQ entered into a design patent license with GM. After GM entered into a design patent license agreement with LKQ, GM substantially accelerated its efforts to obtain design patents. It has only further accelerated since, to the extent that GM has now obtained an unprecedented number of design patents, including almost 600 patents issued since January of 2018, most of which cover individual exterior body parts and components.

14.     Fueled by this recent glut of design patents, the century-long paradigm of aftermarket industry access has abruptly inverted: for new GM vehicles, competition and consumer choice is now the exception for replacement parts, and OEM-exclusivity is the rule. Although GM's emotionally charged rhetoric casts this state of affairs as the norm, that is revisionist at best; GM's recent activities are an aberration from the norm, statistically, economically, and morally. This remarkable deviation from trend appears to have nothing do with quality control, and even less to do with safeguarding the incentive to develop innovative automobile designs; progress and innovation in the art of automotive design was alive and well in the century preceding 2009. GM's remarkable deviation from the trend is driven by the desire for revenue and to better capitalize on its captive market. Indeed, one of the core elements of the strategy implemented by GM's Customer Care and Aftersales Group—the group responsible for GM's sales of replacement parts—is to obtain design patents on replacement parts and then leverage those patents to exclude competition, including specifically LKQ. In that regard, GM obtains design patents on parts that are likely to be damaged in an accident on high volume vehicles. GM does not base its decision on whether to seek a design patent on the novelty of the design, but rather, on whether the part is a crash part likely to be damaged in an accident. Further, GM's general practice is to disclose large volumes of largely irrelevant prior art and to withhold the most pertinent prior art in an effort to obtain design patents it otherwise would not likely be able to obtain. Then, GM relies on its

ability to leverage its size, intimidate other market participants, and ultimately, but as a last resort, to bring a lawsuit asserting those patents in order to keep the market to itself. Indeed, GM has a history of threatening to assert its design patents against market participants and competitors beyond just LKQ.

16. Tellingly, GM's runaway patent acquisition practices clamp down not on derivative designs of its vehicle, much less "pirates" or "copycats," but on aftermarket industry competition in the replacement parts market. These anticompetitive efforts run in lockstep with GM's activities in other regimes, such as its recent trend towards stamping or incorporating its purported trademarks into the molds of its automobile grilles (once again, an effort to exclude the aftermarket industry from providing correct replacement parts without obtaining GM's permission to compete and paying a licensing fee). GM's goal is to lock GM vehicle owners into purchasing only those replacement parts GM allows them to use for the fifteen-year term of GM's design patents, and indefinitely for parts having GM trademarks molded into them, sharply limiting the vehicle owners' choices regarding whether and how to repair and maintain their automotive investments and depriving such vehicle owners of the potential value the aftermarket industry could provide them and their vehicles.

16. By thus capturing the market, GM opens the door to secretly exact ever-increasing premiums from their customers after locking them in with the initial sale, elevating GM's profits at the expense of consumers and without their knowledge by increasing the costs of maintaining GM vehicles, increasing insurance costs, and increasing the rate at which GM vehicles would be declared total losses upon suffering collision damage that would otherwise be reparable. All of these harms flow from GM's invalid application of design patents: as shown and alleged herein, GM has asserted patents that are invalid over the prior art and has stretched them well beyond their

appropriate scope.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this action and the matters pleaded herein under 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and the Patent Act of the United States, 35 U.S.C. § 101, *et seq.*

18. This Court has personal jurisdiction over Defendants because, on information and belief, Defendants have continuous and systematic contacts with the state of Illinois and this Judicial District, have affirmatively directed infringement accusations at LKQ in this Judicial District, pursued such claims, and communicated such accusations to third parties in the Judicial District, such that Defendants' submission to personal jurisdiction would be fair and reasonable.

19. Venue against Defendants is proper because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and Defendants are subject to personal jurisdiction in this Judicial district. 28 U.S.C. § 1391(b)(2) and (3).

## STANDING

20. For many decades, LKQ and its predecessors, and others in a vast aftermarket parts industry, have been importing and offering for sale replacement automotive parts including grilles, fenders, bumpers, and more. LKQ's business model in the United States automotive repair parts market is to be a comprehensive source of all automotive body repair parts for its customers. Thus, its general practice is and has been to offer nearly every, if not every, automotive body repair part for virtually every mainstream vehicle model available unless doing so would be in violation of law (such as if a part were covered by a valid and unlicensed patent). LKQ has infrastructure and business agreements in place that enable it to obtain and sell virtually all automotive body repair

8

parts for virtually all mainstream GM vehicle models, and but for the existence of GM's design patents, LKQ is ready, willing, able to, and would do so for essentially all such vehicles' parts.

21.     LKQ products are of a consistently high quality.  Due to its long-standing presence in the aftermarket industry and its reputation for quality, LKQ has become a national leader among replacement part providers.

22.     GM acquires and maintains its design patent portfolio as an essential part of its repair part revenue model and strategy.  Especially in the United States, GM has dedicated considerable resources and attention into obtaining and defending its stake in the market for replacement parts for its vehicles.

23.     As mentioned above, GM and LKQ have historically been parties to a confidential Design Patent License Agreement ("DPLA") under which LKQ was granted a license to many of GM's design patents.  The DPLA contemplates the periodic addition of new patents to an ever-growing list of licensed intellectual property as GM acquires design patents on its new vehicle models.  LKQ continues to operate in accordance with the DPLA, including paying royalties for parts covered by the Licensed GM Design Patents.

24.     While the relationship between the parties was once amicable and GM viewed the DPLA as an essential part of its intellectual property protection strategy, GM eventually stopped acting in accordance with the expectations of the parties when they entered into the DPLA, and the course of conduct in the years immediately after entering into the DPLA.  For example, GM stopped adding new design patents into the DPLA.  This had two significant impacts.  First, GM's new design patents were not licensed, limiting the new parts LKQ could launch.  And second, this means the DPLA will terminate on or about February 22, 2022.  Further, GM's refusal to add new patents evinced a change in strategy; GM now seemed intent on excluding LKQ from selling repair

parts for GM vehicles that were purportedly covered by a design patent. With respect to the instant litigation, GM specifically considered whether to add U.S. Design Patent Nos. D818,406 and D828,256 to the DPLA but decided not to add these patents to the DPLA. GM's refusal to add U.S. Design Patent Nos. D818,406 and D828,256 to the DPLA were each an affirmative act of GM pursuant to which GM impliedly asserted to LKQ that any effort by LKQ to launch a product that might allegedly be covered by U.S. Design Patent Nos. D818,406 and D828,256 would not be countenanced by GM.

25.    In 2017, GM also issued a unilateral demand to alter the terms of the DPLA. Thereafter, and for years, GM and LKQ attempted to negotiate a design patent license agreement that would avoid litigation of this type. But during these negotiations, GM refused to compromise on its demands. Further, GM insisted that LKQ could not sell parts corresponding to its parts that were allegedly covered by design patents (including, but not limited to, the LKQ parts at issue in this complaint) absent a new license agreement.

26.    Despite LKQ's good faith effort to directly negotiate terms of the DPLA, GM escalated its effort to drive LKQ out of the replacement market for parts for GM vehicles allegedly covered by design patents, including the parts at issue in this litigation, by sending patent assertion letters to CCC, Mitchell, and Solera that any non-GM parts corresponding to the GM parts "covered by the patents listed on Exhibit B are unauthorized and therefore infringing." This list specifically includes the parts at issue in this litigation. CCC, Mitchell and Solera offer software platforms used by autobody shops to order repair parts. Most repair parts are sold through these programs. So, in other words, GM sent letters to the entities through which most repair parts are sold telling them that the sale of any non-GM part set forth on Exhibit B would infringe GM design patents. Included on that list were the LKQ parts at issue in this litigation.

10

27. Specifically, on March 1, 2019, although unknown to LKQ at the time and even though LKQ and GM were in the midst of license negotiations, GM's Counsel, Angela Caligiuri, sent a letter to CCC asserting that, "GM takes policing and enforcement of its intellectual property rights seriously."

28. The March 1, 2019 letter from GM's in-house attorney to CCC did acknowledge that LKQ was licensed to some of GM's patents, but then set forth a long list of patents that it claimed were not licensed to anyone. GM specifically noted that U.S. Design Patent Nos. D818,406 and D828,256 were not licensed to LKQ, listing them on Exhibit B. GM went on to state that, "[a]ll other parts covered by the patents listed on Exhibit B are unauthorized and therefore infringing." In other words, all non-GM aftermarket replacement parts corresponding to parts allegedly covered by U.S. Design Patent Nos. D818,406 and D828,256 were infringing. GM went on to request that the identified parts be removed from CCC's software platform. *See* Exhibit 1 ("March 2019 GM Letter").

29. Again, although unknown by LKQ at the time and despite the fact that LKQ and GM were involved in license negotiations, GM sent virtually identical letters to Solera and Mitchell, the other major parts platforms, on the same day, in a coordinated effort to keep LKQ's products out of the market. As noted, nearly all sales of replacement automobile parts flow through the platforms managed by CCC, Mitchell, and Solera. Accordingly, GM specifically, albeit indirectly, accused LKQ of infringing U.S. Design Patent Nos. D818,406 and D828,256. GM's letters to CCC, Mitchell, and Solera were a clear articulation of its position that any aftermarket replacement parts sold by anyone that correspond to the GM parts it claimed were covered by U.S. Design Patent Nos. D818,406 and D828,256, including LKQ, would infringe U.S. Design Patent Nos. D818,406 and D828,256. In addition, were these platforms to de-list LKQ products, LKQ

11

would effectively be prohibited from selling its replacement parts corresponding to the GM part allegedly covered by GM's patents.

30.     At the time these letters were sent, CCC maintained a database correlating LKQ aftermarket replacement parts to corresponding GM parts. On information and belief, GM was aware that CCC would be able to correlate GM part numbers with any corresponding LKQ part numbers. Thus, on information and belief, by indicating that LKQ was not authorized to manufacture parts corresponding to identified GM part numbers, GM knowingly and intentionally alleged to CCC that the LKQ part numbers CCC knew to correspond to the enumerated GM part numbers infringed GM's correspondingly identified design patents. Indeed, it was GM's intention, through its threats to CCC, Solera, and Mitchell, to enforce its patents against LKQ without the cost of litigation and without the risk of subjecting its patents to the scrutiny they deserve.

31.     GM's infringement accusations directed at CCC, Mitchell, and Solera are effectively infringement accusations directed at LKQ, inasmuch as LKQ is one of the largest suppliers of replacement parts on the CCC, Mitchell, and Solera platforms, so, on information and belief, GM was specifically targeting LKQ's products.

32.     GM's letters to CCC, Mitchell, and Solera were more than a communication from a patent owner to another party merely identifying its patent and the other party's product line. Indeed, GM repeatedly asserted that any non-GM aftermarket replacement parts corresponding to the parts GM claimed were covered by the unlicensed patents included in Exhibit B to the letters to CCC, Mitchell, and Solera, including but not limited to U.S. Design Patent Nos. D818,406 and D828,256, infringed those patents.

33.     Thereafter, again unbeknownst to LKQ at the time and despite ongoing license negotiations between LKQ and GM, in December of 2019, GM provided a PowerPoint

presentation to CCC in furtherance of its efforts to exclude LKQ's products from the market. In addition, also unbeknownst to LKQ at the time and despite ongoing license negotiations between LKQ and GM, GM provided Mitchell and Solera with similar presentations in furtherance of its efforts to enforce—indirectly—its design patents, including the GM Design Patents At Issue, against LKQ's products. Each of these presentations were additional affirmative acts by GM accusing, indirectly, LKQ of infringing GM's patents.

34. On March 4, 2020, CCC sent a letter to LKQ requesting that LKQ remove certain parts allegedly covered by the GM Design Patents At Issue from CCC's platform. *See* Exhibit 2 ("March 2020 CCC Letter"). Specifically, CCC directed LKQ to "provide specifics that can be shared with GM or contact General Motors directly." *Id.* at 1. This letter was LKQ's first notice that GM was secretly trying to disrupt its business relationships while simultaneously engaging in license negotiations.

35. On information and belief, it was GM who caused and/or directed CCC to request LKQ remove a number of products.

36. Moreover, GM's correspondence with CCC, Mitchell, and Solera specifically identified GM's OEM website, https://www.genuinegmparts.com/counterfeit-auto-parts, as the baseline for delisting LKQ products from their platforms and effectively instructed these platforms to de-list all products corresponding to parts that GM claims are covered by their design patents indicated as "GM Exclusive." This list has been available on GM's "counterfeit-auto-parts" web page consistently since at least early 2000 and updated numerous times since GM's initial letters to CCC, Mitchell, and Solera, including as recently as March 2021. These lists include the Patents In Suit, and identify them as "GM Exclusive," which GM explains as "not licensed to any aftermarket seller." GM furthers states as to these parts, "unlicensed making, using, and/or selling

of a protected part could constitute an infringement of a GM design patent. It's important to know this because the use of non-OEM parts on newer Chevrolet, Buick, GMC, or Cadillac vehicles could constitute an infringement of a GM design patent. When in doubt, always insist on Genuine GM Parts." In context, at the very least, each update constitutes a renewed accusation of infringement and a renewed intention to enforce by GM. Further, and on information and belief, GM has had and continues to have on-going discussions with CCC, Mitchell, and Solera pursuant to which GM has continued to threaten them with liability for patent infringement if they list any LKQ products that correspond to parts GM claims are covered by design patents that are not licensed, like the '406 Patent and the '256 Patent. Thus, GM has threatened and continues to threaten third parties with infringement on an on-going basis in order to functionally allege infringement by LKQ, doing so not only when it first engaged in this conduct, but through the present day. Also, on information and belief, GM and CCC, Mitchell, and Solera continue to have discussions on how best to make sure that CCC, Mitchell, and Solera do not list any parts that GM has identified as corresponding to a patented part.

37. GM has never altered its position as set forth in its correspondence with CCC, Mitchell, and Solera that any product allegedly covered by like the '406 Patent and the '256 Patent infringes and should be barred from the market, even though it has had ample time to do so.

38. Furthermore, under the guise of exercising its rights under the DPLA, GM has recently been conducting an audit of LKQ's sale of relevant parts. But GM's inquiry has extended beyond its rightful scope in both substance and duration: querying activity related to parts not subject to the DPLA for an unreasonably long period of time. Indeed, GM first demanded sales and importation data for <u>all</u> LKQ parts, regardless of whether those parts corresponded to patents listed on the DPLA or whether those parts even corresponded to GM-made vehicles. Later, GM

14

demanded LKQ parts data for any LKQ part that could correspond to a GM-made vehicle, regardless of whether it corresponded to a patent on the DPLA. Seeking and gathering this information implicitly constitutes a threat that GM will assert infringement for any unlicensed part that corresponds to a GM part that is allegedly covered by a GM design patent. Gathering information in such a manner also has the purpose of preparing for litigation or giving the appearance of preparing for litigation. Thus, regardless of GM's intention in conducting the audit, LKQ faces the immediate and intimidating specter of infringement in all of its activity related to unlicenced parts corresponding to parts allegedly covered by GM patents, including those covered by the '406 Patent and the '256 Patent.

39.     Shortly after LKQ learned of GM's secret patent infringement assertions, it brought a declaratory judgment action as to certain parts that were encompassed by GM's threats and that LKQ was prepared to begin selling in the United States. In that ongoing declaratory judgment action in this Court, Case No. 1:20-cv-2753, GM has asserted infringement claims against LKQ related to those parts. GM first raised these infringement claims on August 7, 2020, as to one of the parts, and September 11, 2020, as to the remaining parts, and has continued to pursue them up to and including the filing of this amended complaint. The patents and parts in Case No. 1:20-cv-2753 are replacement parts for vehicles, just like those at issue in this case. Notably, included in GM's counterclaims is a claim seeking a declaration that LKQ Part Nos. GM1230463 and GM1230463C, neither of which LKQ has sold, produced, offered for sale, or imported into the U.S., infringe U.S. Patent No. D824,825. Further, in that case, GM has accused LKQ of willfully infringing three of the four GM patents-in-suit.

40.     Other litigation conduct in the above-referenced case also supports jurisdiction here. For example, GM sought through discovery, and ultimately moved to compel, information

regarding all GM-compatible parts sold by LKQ since 2018, even though the scope of the litigation was much narrower: four patents and seven LKQ parts. And in arguing for that discovery, GM asserted that, "LKQ is in the business of copying GM's innovative designs." Further, GM accused LKQ of "systemic, intentional copying of patented products and blatant disregard for GM's intellectual property," "pirate-like behavior," and of being "a habitual infringer." GM also asserted that LKQ was a "wanton and malicious pirate" who "intentionally infringes another's patent—with no doubts about its validity or any notion of a defense—for no purpose other than to steal [GM's] business." GM also claimed that "LKQ's entire business revolves around copying and selling exact replicas of automotive replacement parts. While not all vehicle parts are patented, LKQ conducts its business without respecting the intellectual property rights of OEM's, such as GM." Finally, and perhaps most importantly, GM claimed that it "certainly has ample 'basis to assert or believe that [at least some of] the thousands of products' LKQ sells infringe GM's intellectual property." This is a clear and plain accusation of patent infringement, not limited to the seven parts at issue in the prior litigation between GM and LKQ, but effective an accusation of infringement as to all parts corresponding to parts that GM claims are covered by its design patents, including the parts that allegedly practice the '406 Patent and the '256 Patent.

41. GM's conduct in the audit, the current district court litigation, and with CCC, Solera, and Mitchell, amounts to immediate allegations of infringement for any and all parts corresponding to parts for which it allegedly has design patents, including the products that allegedly practice the '406 Patent and the '256 Patent. Additionally, GM's conduct requires LKQ to either (a) not offer the replacement parts allegedly covered by the '406 Patent and the '256 Patent, or (b) risk treble damages.

16

42.     LKQ does not infringe the '406 Patent or the '256 Patent.  Further, the '406 Patent and the '256 Patent are invalid as anticipated or obvious over the prior art, and purport to cover unpatentable subject matter.  In addition, on information and belief, the '406 Patent and the '256 Patent are likely invalid based on the on-sale bar and based on the public disclosure of the designs claimed by the '406 Patent and the '256 Patent more than a year before the applications that led to those patents were filed.  Accordingly, LKQ has the right to sell its parts allegedly covered by the '406 Patent and the '256 Patent.

43.     As explained in greater detail below, LKQ has taken substantial steps towards making available the parts GM alleges to infringe its design patents.  In summary, LKQ and the manufacturer for the parts allegedly covered by the '406 Patent and the '256 Patent have finalized designs for such parts, developed and constructed tooling enabling the manufacture of those parts, assigned part numbers to these parts, commenced mass-manufacture of such parts for sale in foreign markets, placed orders for those parts with the manufacturer, imported these parts into the United States such that LKQ currently has inventory of these parts in the United States, placed additional orders for additional parts which are in transit to the United States, entered these parts into LKQ's ERP system and flagged them as active in the system, which means LKQ can issue additional purchase orders to the manufacturer for these parts and that these parts are OK to sell, and will be offering them for sale in the first quarter of 2022 once inventory levels can meet the expected demand.

44.     LKQ first received the parts allegedly covered by the '406 Patent and the '256 Patent in November of 2021 and these parts were first available or ready to be sold in January of 2022.

17

45.     In sum, LKQ has basically taken all steps necessary to begin selling the parts allegedly covered by the '406 Patent and the '256 Patent except having them listed on the CCC, Mitchell, and Solera platforms, but plans to do so in the first quarter of 2022.  But for the threat of GM's assertion of the '406 Patent and the '256 Patent, LKQ would already be selling the parts allegedly covered by those patents today.  Accordingly, LKQ is currently being denied the revenue it would be able to receive were it not for GM's threats and LKQ is being prevented from exercising its right to sell its parts allegedly covered by the '406 Patent and the '256 Patent.

46.     LKQ's business model in the aftermarket replacement parts market is to provide nearly every replacement part for every mainstream vehicle model, and it has developed a supply chain comprising dozens of vendors and tens of thousands of employees tasked with realizing that goal and bringing that business plan to fruition.  GM is preventing LKQ, through its threats of infringement, from fully exercising its business model.

47.     LKQ intends to sell parts that it believes in good faith not to infringe any valid GM patent, such as those parts implicated by this complaint.  LKQ has initiated this action in furtherance of its intent to sell the implicated parts in the United States, and will do so if it prevails.

48.     GM has never assured LKQ that it would not assert that LKQ infringes the '406 Patent and the '256 Patent in the event LKQ launches parts allegedly covered by these patents, even though GM has had ample opportunity to do so.  Indeed, LKQ has asked GM for a covenant not to sue relating to the '406 Patent and the '256 Patent, but GM has refused to provide LKQ with a covenant not to sue.

49.     GM's letters to CCC, Mitchell, and Solera, its on-going communications with CCC, Mitchell, and Solera, its website asserting its patents including the '406 Patent and the '256 Patent, GM's refusal to include the '406 Patent and the '256 Patent in the DPLA, its litigation conduct, its

18

conduct in the audit, and its refusal to provide a covenant not to sue, are all affirmative acts of GM

that demonstrate an intent to enforce the '406 Patent and the '256 Patent.

50.     By virtue of the foregoing, a real and substantial controversy exists between the

parties that is of sufficient immediacy to warrant declaratory relief.

51.     Absent a declaration that LKQ does not infringe the '406 Patent and the '256 Patent

and/or that the '406 Patent and the '256 Patent are invalid, LKQ will be forced to accrue potential

damages and face a willful infringement claim until GM decides to file suit or reverse its decision

to begin selling the parts that allegedly practice the '406 Patent and the '256 Patent.  This is both

a real and immediate injury and a threat of future injury.  And this is exactly why the Declaratory

Judgment Act was put in place.

## <u>GENERAL ALLEGATIONS</u>

52.     The March 2019 CCC Letter identified a number of automotive parts on the CCC

software platform, which allegedly correspond to the following GM design patents:

| GM Part Number | GM Design Patent | LKQ Part Number |
|---|---|---|
| GM84314965 | D818406 | GM1240409 |
| GM84314966 | D818406 | GM1241409 |
| GM84496744 | D828256 | GM1240413 |
| GM84496745 | D828256 | GM1241413 |

53.     Images of the LKQ parts that correspond to the above-listed LKQ part numbers are

set forth below.  Each of the below-depicted parts is ready to be sold by LKQ and was asserted by

GM, directly or indirectly, to infringe a GM design patent.  Each of the LKQ parts is compared in

the table below with the correspondingly referenced GM Design Patent At Issue:

54.     All of the GM Design Patents At Issue were expressly alleged to cover a part that

LKQ is ready to sell and a case and controversy exists as to each of them.

19

55.     LKQ has already taken substantial steps towards offering each of these parts in the United States, and by the end of the first quarter of 2022, LKQ will be offering the parts allegedly covered by the the '406 Patent and the '256 Patent for sale within the United States.

56.     Each of the GM Design Patents At Issue is assigned to GM Global Technology Operations, LLC.

**NON-INFRINGMENT ALLEGATIONS – THE '406 PATENT**

57.     The '406 Patent was filed on October 14, 2016, and issued on May 22, 2018.  *See* Exhibit 3.

58.     The '406 Patent claims "[t]he ornamental design for a vehicle front fender, as shown and described."  *Id*.

59.     The '406 patent claims only the right-sided fender.

60.     The below comparison illustrates the alleged infringing parts compared to the alleged GM design patent:

| LKQ Part Image | GM Design Patent |
|:---:|:---:|
|  | |

| LKQ Part Image | GM Design Patent |
|---|---|



61.     LKQ does not infringe GM's '406 Patent because an ordinary observer would not be confused into thinking that the design of the LKQ parts and the design covered by the '406 Patent are substantially similar.

62.     At a minimum, and by way of example, the parts produced by LKQ have a different design line underneath the line that extends from the headlight:

| LKQ Part Image | GM Design Patent |
|---|---|



63.     Further, at a minimum, and by way of example, the LKQ Part # GM1240409 does

not infringe the '406 Patent because the '406 Patent does not claim the left-sided fender:

| LKQ Part Image | GM Design Patent |
|---|---|
|  | |

64. Thus, LKQ does not infringe the '406 Patent.

## NON-INFRINGEMENT ALLEGATIONS – THE '256 PATENT

65.     The '256 Patent was filed on June 29, 2017, and issued on September 11, 2018.
*See* Exhibit 4.

66.     The '256 Patent claims "[t]he ornamental design for a vehicle fender, as shown and
described." *Id.*

67.     The below comparison illustrates the alleged infringing part compared to the
alleged GM design patent:



| LKQ Part Image | GM Design Patent |
|---|---|
| LKQ Part # GM1240413 | *Id.*, FIG. 1. |
| LKQ Part # GM1241413 | *Id.* |

68. LKQ does not infringe GM's '256 Patent because an ordinary observer would not be confused into thinking that the design of the LKQ parts and the design covered by the '256 Patent are substantially similar.

69. At a minimum, and by way of example, the part produced by LKQ does not have an extra crease claimed by the '256 Patent. Further, at a minimum, and by way of example, the

design line around the wheel arch does not terminate at around the mid-point in the LKQ part,

unlike in the '256 Patent. Both of these exemplary differences are highlighted below:



| LKQ Part Image | GM Design Patent |
|---|---|

70. Thus, LKQ does not infringe the '256 Patent

## INVALIDITY ALLEGATIONS – THE '406 PATENT

71.     The '406 Patent is invalid, at a minimum, as obvious over the prior art.

72.     At a minimum, and by way of example, the '406 Patent is obvious over the 2016

Mitsubishi Pajero Sport in light of the 2015 Toyota Tundra.

73.     The 2016 Mitsubishi Pajero Sport's fender design is basically the same as the

claimed design of the '406 Patent. *See* Exhibit 5, at 1. The below chart compares exemplary

images of the 2016 Mitsubishi Pajero Sport's fender to the claimed design of the '406 Patent:

| '406 PATENT | 2016 MITSUBISHI PAJERO SPORT'S FENDER |
|---|---|
| <br><br>Ex. 3, FIG. 1 | <br><br>Ex. 5 at 5 |

74.    The 2016 Mitsubishi Pajero Sport was publicly available, sold, and purchased by consumers and images of the 2016 Mitsubishi Pajero Sport were publicly available, at least, as early as 2016, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

75.    Any difference between the '406 Patent and the 2016 Mitsubishi Pajero Sport's fender is suggested by the secondary reference, the 2015 Toyota Tundra.  *See* Exhibit 6 at 1.

76.    The appearance of the 2016 Mitsubishi Pajero Sport's fender is so related to the 2015 Toyota Tundra's fender that the appearance of features in one would suggest the application to the other:

25

| 2016 MITSUBISHI PAJERO SPORT'S FENDER | 2015 TOYOTA TUNDRA'S FENDER |
|---|---|
|   Ex. 5 at 5 |   Ex. 6 at 1 |

77. The fender design of the 2016 Mitsubishi Pajero Sport has a similar overall shape as the fender design of the 2015 Toyota Tundra.

78. The 2015 Toyota Tundra was publicly available, sold, and purchased by consumers and images of the 2015 Toyota Tundra were publicly available, at least, as early as 2015, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

79. The features of the fender design of the 2016 Mitsubishi Pajero Sport combined with the features of the fender design of the 2015 Toyota Tundra would create a design with substantially the same overall visual appearance as the '406 Patent.

80. Given the relatedness of the two designs, an ordinary designer would have been motivated to combine the fender design of the 2016 Mitsubishi Pajero Sport with the fender design

26

of the 2015 Toyota Tundra to arrive at a design that is substantially the same as the claimed design of the '406 Patent.

81. Thus, the '406 Patent is invalid, at a minimum, as obvious.

## INVALIDITY ALLEGATIONS – THE '256 PATENT

82. The '256 Patent is invalid, at a minimum, as obvious over the prior art.

83. At a minimum, and by way of example, the '256 Patent is obvious over the 2015 Chevrolet Colorado in light of the design claimed by the D614,100 patent.

84. The 2015 Chevrolet Colorado's fender design is basically the same as the claimed design of the '256 Patent. *See* Exhibit 7, at 1. The below chart compares exemplary images of the 2015 Chevrolet Colorado's fender to the claimed design of the '256 Patent:

| THE '256 PATENT | 2015 CHEVROLET COLORADO'S FENDER |
|:---:|:---:|
|  *FIG - 1* <br><br> Ex. 4, FIG. 1 | Ex. 7 |

85.     The 2015 Chevrolet Colorado was publicly available, sold, and purchased by consumers and images of the 2015 Chevrolet Colorado were publicly available, at least, as early as 2015, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

86.     Any difference between the '256 Patent and the fender of 2015 Chevrolet Colorado is suggested by the secondary reference, the D614,100 patent.  *See* Exhibit 8.

87.     The appearance of the design claimed by the D614,100 patent is so related to the 2015 Chevrolet Colorado's fender that the appearance of features in one would suggest the application to the other:

| 2015 CHEVROLET COLORADO'S FENDER | D614,100 |
|---|---|
|  Ex. 7 | Figure 1 <br> Ex. 8, FIG. 1 |

88.     The design of the 2015 Chevrolet Colorado's fender has a similar overall shape as the design claimed by the D614,100 patent.

28

89.     The priority date of the D614,100 patent is April 3, 2008, and it thus constitutes prior art under at least 35 U.S.C. § 102(a)(1).

90.     The features of the 2015 Chevrolet Colorado's fender combined with the claimed design of the D614,100 patent would create a design with substantially the same overall visual appearance as the '256 Patent.

91.     Given the relatedness of the two designs, an ordinary designer would have been motivated to combine the fender design of the 2015 Chevrolet Colorado with the design claimed by the D614,100 patent to arrive at a design that is substantially the same as the claimed design of the '256 Patent.

92. Thus, the '256 Patent is invalid, at a minimum, as obvious.

### COUNT I – NON-INFRINGEMENT OF THE '406 PATENT

93.     LKQ realleges and incorporates Paragraphs 1–72 as if fully set forth herein.

94.     LKQ does not infringe the '406 Patent because the allegedly infringing LKQ parts are not within the scope of and do not infringe the claim of the '406 Patent.

95.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '406 Patent.

### COUNT II – NON-INFRINGEMENT OF THE '256 PATENT

96.     LKQ realleges and incorporates Paragraphs 1–75 as if fully set forth herein.

97.     LKQ does not infringe the '256 Patent because the allegedly infringing LKQ parts are not within the scope of and do not infringe the claim of the '256 Patent.

98.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that LKQ does not infringe the claim of the '256 Patent.

## COUNT III – INVALIDITY OF THE '406 PATENT

99.     LKQ realleges and incorporates Paragraphs 1–78 as if fully set forth herein.

100.     The claim of the '406 Patent is invalid, at a minimum, as obvious over the prior art.

101.     The claim of the '406 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

102.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '406 Patent is invalid.

## COUNT IV – INVALIDITY OF THE '256 PATENT

103.     LKQ realleges and incorporates Paragraphs 1–82 as if fully set forth herein.

104.     The claim of the '256 Patent is invalid, at a minimum, as obvious over the prior art.

105.     The claim of the '256 Patent is further invalid because it is not an "article of manufacture," but rather a component part.

106.     As a result of the acts described in the foregoing paragraphs, a substantial controversy of sufficient immediacy and concreteness exists to warrant the issuance of a declaratory judgment that the claim of the '256 Patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, LKQ prays for:

a. A declaration that LKQ has not infringed and is not infringing, directly or indirectly, the claim of the '406 Patent or the '256 Patent;

b. A declaration that the single claims of the '406 Patent and '256 Patent are invalid;

c. An order that GM and each of its officers, employees, agents, attorneys, and any persons in active concert or participation with them are restrained and enjoined from further prosecuting or instituting any action against LKQ or the purchasers of LKQ's products claiming that the alleged patents are infringed or from representing that LKQ's products or their use on networks operated by purchasers of those products infringe the alleged patents;

d. A declaration that this is an exceptional case under 35 U.S.C § 285;

e. An award to LKQ of its costs and attorneys' fees;

f. Such other relief as this Court or a jury may deem proper and just under the circumstances.

## JURY DEMAND

LKQ demands a trial by jury on all issues so triable.


Dated: January 14, 2022                                  Respectfully submitted,


                                                         */s/ Barry F. Irwin, P.C.*
                                                         Barry F. Irwin, P.C.
                                                         Michael P. Bregenzer
                                                         Robyn Bowland
                                                         Nick Wheeler
                                                         **IRWIN IP LLC**
                                                         180 N. Wacker Drive
                                                         Suite 400
                                                         Chicago, IL  60606
                                                         (312) 667-6080
                                                         birwin@irwinip.com
                                                         mbregenzer@irwinip.com
                                                         rbowland@irwinip.com
                                                         nwheeler@irwinip.com

                                                         *Attorneys for Plaintiffs LKQ Corporation &*
                                                         *Keystone Automotive Industries*