**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LKQ CORPORATION and | ) | Case No. 1:21-cv-05854 |
| KEYSTONE AUTOMOTIVE | ) | |
| INDUSTRIES, INC., | ) | Honorable Jorge L. Alonso |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS COMPANY, | ) | |
| GM GLOBAL TECHNOLOGY | ) | |
| OPERATIONS, LLC and | ) | |
| GENERAL MOTORS LLC | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISQUALIFY</u>

## INTRODUCTION

LKQ misstates applicable law, misrepresents material facts, and requests a remedy – wholesale disqualification of GM's chosen law firm – that is wildly disproportionate from the true facts. Fish & Richardson P.C. ("F&R") hired paralegal Gloria Rios following a routine search for candidates, a standard interview process with clear instruction not to disclose confidential information, a robust conflicts screening procedure, and a broad ethical wall to ensure Ms. Rios could not access or share any documents or information related to this matter or any other matter adverse to LKQ. F&R implemented this broad ethical wall prior to Ms. Rios's first day at F&R, and LKQ presents no evidence (because there is none) that any LKQ confidential information has been disclosed to F&R. Despite its attempts to manufacture a narrative against F&R, LKQ has zero evidence of any impropriety and thus zero basis to seek disqualification. LKQ's Motion borders on harassment, and the defamatory, ill-founded allegations that LKQ lodges against both Ms. Rios and F&R have no place in this Court. LKQ's motion should be denied.

## FACTUAL BACKGROUND

### A.   F&R's Unique Knowledge of this Case and Extensive Representation of GM.

F&R is one of the country's premier patent litigation firms, as routinely recognized by publications such as *Chambers USA*, *BTI Consulting Group*, *Managing IP*, and *IAM Patent 1000*. F&R has represented GM for over five years in its complex, multi-forum dispute with LKQ, including this case, a co-pending case in this District, 25 different proceedings at the PTO, and in multiple Federal Circuit appeals. All of those proceedings impact this case. In this district court alone, more than a dozen different motions have been filed, more than 50 collective depositions have been taken, and millions of dollars have been spent by GM to defend its intellectual property rights. LKQ is fully aware of these facts and yet seeks to deprive GM of its chosen counsel based upon F&R's hiring of Gloria Rios.

1

**B.** **F&R Hired Ms. Rios After Implementing Appropriate Ethical Safeguards.**

F&R listed a job posting for a litigation paralegal role on its website on December 2, 2024. Affidavit of Dené Maloney attached hereto as **Exhibit A**, at ¶¶ 3, 4. After the job remained unfilled for over a month, F&R's Talent Acquisition Lead, Ms. Maloney, began searching for qualified candidates via LinkedIn's recruiter search tool. Ex. A at ¶ 5. On January 6, 2025, she performed a search for litigation paralegals located in Chicago with one keyword: IP (for "intellectual property"). Ex. A at ¶ 6. Perhaps unsurprisingly, one of the search results was Gloria Rios, a **litigation paralegal** located in **Chicago** who was then-employed by the law firm Irwin **IP** LLP ("Irwin IP"). Ex. A at ¶ 7. Based upon her search results, Ms. Maloney messaged approximately 25 candidates to gauge their interest in the position, including Ms. Rios. Ex. A at ¶ 8.

Ms. Rios's first communication from F&R concerning the open position was on January 6, 2025. Ex. A at ¶ 9. Prior to messaging Ms. Rios, Ms. Maloney did not know Ms. Rios, was not familiar with her name, and was not aware of Ms. Rios's participation in this matter (or any other LKQ matter) at Irwin IP. Ex. A at ¶ 10. Nor was Ms. Maloney ever instructed to recruit Ms. Rios based upon her work at Irwin IP. Ex. A at ¶ 12. Indeed, Ms. Maloney has no way of knowing what cases a candidate is involved in based on performing a LinkedIn search. Ex. A at ¶ 11.

Ms. Rios responded on January 7, 2025, disclosing that she was currently providing paralegal support in two adverse cases. Ex. A at ¶ 13. After speaking with Ms. Maloney further, Ms. Rios submitted an application on January 9, 2025. Ex. A at ¶ 14. Ms. Maloney scheduled interviews for Ms. Rios to begin January 10, 2025. Ex. A at ¶ 15. Based on Ms. Rios's disclosure, F&R instructed Ms. Rios not to discuss the LKQ matters during her interviews. Affidavit of Gloria Rios attached hereto as **Exhibit B**, at ¶ 5. Likewise, no F&R employee solicited any confidential information from Ms. Rios during the interview process. Ex. B at ¶ 6. Ms. Rios followed these

instructions and did not discuss or disclose confidential information concerning any matter during the interview process. Ex. B at ¶ 7; Affidavits of Jodi Soucek (at ¶ 7), Janette Riebe (at ¶ 7), and Louis Fogel (at ¶¶ 7-8), attached hereto as **Exhibits C, D, and E**.

After receiving a preliminary job offer, Ms. Rios began the conflicts process with F&R's Lateral Risk Department. Ex. B at ¶ 8. On January 21, 2025, Ms. Rios filled out F&R's standard conflicts questionnaire and returned it to F&R's Jaquis Willis. Ex. B at ¶ 9. Within this questionnaire, Ms. Rios disclosed her entire case list including her prior work on this case. Ex. B at ¶ 10. Upon receiving the completed questionnaire, Ms. Willis searched across all matters at F&R and detected conflicts related to LKQ Corporation and Keystone Automotive Industries, Inc. Affidavit of Jaquis Willis attached hereto as **Exhibit F**, at ¶ 4. Based upon these conflicts, the Lateral Risk Department determined an ethical wall would be necessary. Ex. F at ¶ 4.

Ms. Willis contacted the F&R ethical walls team to request a wall be implemented before Ms. Rios's start date. Affidavit of Lyn Pannell attached hereto as **Exhibit G**, at ¶ 3. Ms. Pannell constructed a "broad" ethical wall, which included *all* matters in which LKQ Corporation and Keystone Automotive Industries (as well as related parties[1]) were listed as adverse to F&R (not just matters the same or substantially related to those that Ms. Rios had worked on). Ex. G at ¶ 5. At F&R, a broad ethical wall is intentionally over-inclusive. Ex. G at ¶ 7. Because of the way the wall was set up and erected, new matters added to F&R's system containing any LKQ or Keystone Automotive entity as an adverse party are automatically added to the ethical wall. Ex. G at ¶ 8. Once the wall was finalized on February 21, 2025, Ms. Pannell sent a firmwide email notifying all F&R personnel about the wall, as well as a second email to the F&R records department instructing them to implement the wall with respect to any physical files. Ex. G at ¶¶ 9, 10, 11.

---

[1] All entities and variations of entity names in F&R's system including the phrases "LKQ" and "Keystone Automotive" were selected for inclusion in the ethical wall. Ex. G at ¶ 6.

By default at F&R, both the litigation document management system and the eDiscovery document management system utilize closed systems, meaning only legal staff added to a given matter can view or access files or materials. Affidavit of Charles DeMille ("Ex. H"), attached hereto as **Exhibit H**, at ¶ 5. Stated differently, F&R does not have any firmwide document or matter search functionality for confidential data. Ex. H at ¶ 6. Once an ethical wall is in place, the employee subject to the wall cannot be added to the litigation document management workspace for any matter impacted by the ethical wall. Ex. H at ¶ 7. With respect to Ms. Rios, this means since before the time she started work at F&R, all F&R employees were electronically blocked from providing Ms. Rios with any access (even inadvertent access) to any litigation case file containing electronic materials for this matter (or any other LKQ matter). Ex. H at ¶ 8. This ethical wall was implemented on February 21, 2025 with respect to all matters involving LKQ or Keystone Automotive-affiliated entities and has remained in place at all times since. Ex. H at ¶¶ 9, 10.

Ms. Rios executed a non-attorney declaration on January 28, 2025, a required step in the F&R conflicts clearance process, which set forth her understanding of her ethical obligations. Ex. F at ¶ 5; Ex. B at ¶ 11. The declaration includes Ms. Rios's confirmations that:

> If, during my employment with [F&R], I am made aware of any ethical walls because of my prior work for former clients, I understand that applicable ethical rules and/or Firm policy require me not to knowingly attempt to access any information, electronic or otherwise, that may include anything related to these entities.
>
> …
>
> I understand that, while employed by [F&R], applicable ethical rules and/or Firm policy require me to immediately request to be ethically walled from any work to be performed by [F&R] that I am aware involves a matter in which: (a) I participated during my former employment; or (b) is substantially related to, or involves substantially similar technology to, the work I did for former employers or their clients. I understand that, if I am in doubt about any specific ethical issue related to my former employment, Firm policy requires me to contact the Conflicts Department.

Non-Attorney Declaration of Gloria Rios, attached hereto as **Exhibit I**, at ¶¶ 5, 7.

### C.     Ms. Rios Departs from Irwin IP; F&R Tries to Meet and Confer with LKQ.

On January 29, 2025, Ms. Rios provided Irwin IP with two weeks' notice concerning her departure. Ex. B at ¶ 12. During that fourteen-day span, Ms. Rios spent a substantial amount of time working on an unrelated matter because Irwin IP's other paralegal, ironically, was ethically walled off from participating in that matter. Ex. B at ¶ 14. Ms. Rios also spoke with several of her colleagues about her departure and told them she was joining F&R. Ex. B at ¶ 15. Despite being told an exit interview would be forthcoming, Ms. Rios did not receive a request to schedule one until February 13, 2025—after her last day at Irwin IP—when she received a request to her personal email. Ex. B at ¶ 16. Ms. Rios did not schedule an exit interview when asked following the end of her employment because she considered her departure to be amicable. Ex. B at ¶ 18.

During her last two weeks at Irwin IP, Ms. Rios did not forward any confidential client information to her personal email address or any other email address. Ex. B at ¶ 20. Ms. Rios recalls all communications between F&R and Ms. Rios related to her hiring, onboarding, and conflicts processes took place on her personal Gmail account, not an Irwin IP email address. Ex. B at ¶ 21. Ms. Rios routinely deleted emails during her work at Irwin IP. Ex. B at ¶ 22. All emails Ms. Rios recalls deleting relating to this case before departing Irwin IP were (1) sent or copied to other Irwin IP employees, (2) uploaded to Irwin IP's email archive, or (3) both. Ex. B at ¶ 23.

Ms. Rios began work for F&R on February 24, 2025. Affidavit of Gloria Rios dated March 10, 2025, attached hereto as **Exhibit J**, ¶ 15. On February 26, 2025, LKQ's counsel demanded F&R withdraw unless F&R could provide evidence that Ms. Rios shared no confidences relating to this matter. ECF Dkt. No. 304-3. Two days later, F&R responded, explaining that it implemented an ethical wall before Ms. Rios's start date, as permitted under applicable ethics rules, and offered to discuss this matter further with counsel. ECF Dkt. No. 304-1. Then, on March

3, 2025, LKQ's counsel sent another letter questioning F&R's ethical wall absent affidavits from the individuals involved. ECF Dkt. No. 304-4. Just a week later, F&R again responded by providing additional information, including sworn affidavits from six F&R employees attesting to the effectiveness of the ethical wall and that no confidential information was ever discussed with Ms. Rios. ECF Dkt. No. 304-2. F&R also renewed its offer to discuss the matter further with LKQ's counsel—but LKQ's counsel never accepted this offer. *Id*. Rather, despite F&R providing voluminous evidence that no ethical violation has occurred and its several offers to meet to discuss LKQ's concerns, LKQ filed its motion seeking F&R's disqualification.

## **LEGAL STANDARD**

Northern District of Illinois Local Rule 83.50 states that the "[a]pplicable disciplinary rules are the Model Rules adopted by the American Bar Association."[2] ABA Model Rule 5.3(b) provides that any "lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." In contrast, ABA Model Rule 1.10(a) defines situations where a conflict of interest can be imputed to others if a conflict of interest arises out of a **lawyer's** association with a prior firm.

Crucially, Comment [4] to ABA Model Rule 1.10 states that non-lawyer conflicts are not imputed to lawyers, particularly when ethical screens are implemented:

> The rule in paragraph (a) also **does not prohibit representation by others in the law firm where the person prohibited from involvement in a matter is a nonlawyer**, such as a paralegal or legal secretary. . . . Such persons, however, ordinarily must be screened from any personal participation in the matter to avoid communication to others in the firm of confidential information that both the nonlawyers and the firm have a legal duty to protect.

---

[2] Local Rule 83.50 also provides that with respect to matters "for which the ABA Model Rules are inconsistent with the Rules of Professional Conduct, a lawyer admitted to practice in Illinois is governed by the Illinois Rules of Professional Conduct." To the extent this Court determines the Illinois rules apply, Illinois Rule of Professional Conduct 1.10 contains a substantially identical Comment 4, so the analysis herein remains unchanged.

Model Rules of Prof'l Conduct R. 1.10, Comment [4] (emphasis added).

Even prior to the addition of Comment [4] to Rule 1.10 in 2002, the American Bar Association recognized that nonlawyers cannot be treated identically to lawyers in the context of imputed disqualification. In a 1988 informal opinion, the ABA Commission on Ethics and Professional Responsibility addressed this exact scenario and concluded as follows:

> A law firm that employs a nonlawyer who formerly was employed by another firm may continue representing clients whose interests conflict with the interests of clients of the former employer on whose matters the nonlawyer has worked, as long as the employing firm screens the nonlawyer from information about or participating in matters involving those clients and strictly adheres to the screening process described in this opinion and as long as no information relating to the representation of the clients of the former employer is revealed by the nonlawyer to any person in the employing firm. . . . Accordingly, any restrictions on the nonlawyer's employment should be held to the minimum necessary to protect confidentiality of client information.

ABA Comm. on Ethics and Professional Responsibility, Informal Op. 88-1526, at 1-2.

The Commission issued Informal Opinion 88-1526 even before Rule 1.10 was modified to allow for screening of attorneys to avoid imputation. The sentiment found in Informal Opinion 88-1526 reflects the majority view for disqualification based on nonlawyer imputation across the country. *See Hodge v. URFA-Sexton, LP*, 758 S.E.2d 314, 319 (Ga. 2014) (collecting cases and noting the "majority approach" which "rather than automatic imputation and disqualification," allows "lawyers hiring the nonlawyer [to] implement screening measures to protect any client confidences that the nonlawyer gained from prior employment").

Seventh Circuit courts traditionally examine disqualification motions by determining (1) whether a substantial relationship exists between the prior and current representations, (2) if so, whether the presumption of shared confidences is rebutted with respect to the prior representation, and (3) if not, whether that presumption is rebutted for the current representation. *Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.*, 637 F. Supp. 1231, 1236 (N.D. Ill. 1985) (internal citations and

quotations omitted). Recent cases in this district have first asked whether any ethical violation has occurred before determining whether disqualification is the appropriate remedy. *Kindstrom v. Lake County*, Case No. 3:22-cv-50041, 2024 WL 916154, at *2 (N.D. Ill. Mar. 4, 2024). In either instance, "disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Kapco*, 637 F. Supp. at 1231.

## ARGUMENT

LKQ seeks the extraordinary remedy of disqualification despite presenting no evidentiary support for its request. Instead, LKQ relies on assumptions, speculation, and inaccurate conclusions, all of which F&R dispels through factual testimony. An objective review of the record evidence reveals that F&R went above and beyond its ethical obligations to ensure client confidences were at all times protected, and LKQ does not provide a single shred of evidence to the contrary. This requires denial of LKQ's disqualification motion.

## I. F&R Promptly Instituted an Ethical Wall as Provided by the ABA Model Rules.

LKQ and F&R agree on one point: the key question here is "whether the methods of screening were sufficient," which is to be assessed on "a case-by-case basis." ECF Dkt. No. 303 at 3. This is because once screening is in place, Comment [4] to Rule 1.10 expressly permits "representation by others in the law firm where the person prohibited from involvement in a matter is a nonlawyer." Here, F&R implemented the broadest possible ethical wall prior to Ms. Rios's first day of employment, notified all employees about that wall and its restrictions, and has consistently enforced that wall in the weeks that Ms. Rios has been with the firm. This is all that is required under the Model Rules and then some. Despite LKQ's fabricated narrative, F&R took thorough and effective steps to ensure that all relevant client confidences were protected before Ms. Rios was even hired. According to LKQ's counsel, F&R must be disqualified simply because it hired their paralegal. That argument has no basis under applicable law.

The undisputed evidence shows that F&R implemented an ethical wall prior to Ms. Rios starting at F&R. The wall covered all matters in F&R's system related to LKQ Corporation and Keystone Automotive Industries Inc., was distributed firmwide at F&R, prevents all digital access to any LKQ related materials, and has remained in place and without breach during Ms. Rios's entire tenure at F&R. Ex. G at ¶¶ 5-11; Ex. H at ¶¶ 9, 10.

LKQ's criticisms of F&R's ethical wall demonstrate its fundamental misunderstanding of how ethical walls function. LKQ accuses F&R for the first time[3] of instituting an inadequate wall because the screening memo did not include other Irwin IP LKQ cases against Kia, Hyundai, and Honda. ECF Dkt. No. 303 at 3. But F&R was (and remains) uninvolved in representing any party in these matters and is not involved in these matters.[4] Accordingly, the only matters in F&R's system with any connection to these cases are the GM matters already subject to the wall. In any event, Ms. Rios remains bound by the statements in her non-attorney declaration that she will "keep confidential any information received from [her prior] employers or from clients of these employers" and that "applicable ethical rules and/or Firm policy require [her] not to disclose any confidential information received in the course of [her] former employment." Ex. I. at ¶¶ 4, 6.

LKQ also repeatedly asserts that F&R implemented its ethical wall "too late" to appropriately protect against the sharing of LKQ confidential information. This assertion lacks any support in applicable law. Affidavit of Mary Robinson, former Administrator of the Illinois Attorney Registration and Disciplinary Commission attached hereto as **Exhibit K**, at 7. Indeed,

---

[3] At no time during the meet and confer process did LKQ voice a concern that F&R's ethical wall was not broad enough because it did not include these other cases. LKQ raised this issue for the first time in its moving papers.
[4] However, Ms. Rios did identify these matters in her conflict disclosure form during the pre-hiring conflicts process, so each of these matters was duly considered by F&R when implementing its ethical wall. The Kia and Hyundai matters previously involved F&R preparing GM's responses to non-party subpoenas, so they are also included in the ethical wall which prevents Ms. Rios from accessing any materials concerning either matter.

the concept of an ethical screen "does not translate to the process of interviewing candidates." Ex. K at 7. Instead, "an express direction . . . to avoid discussing identified confidential matters is both practical and effective." Ex. K at 7. And F&R has submitted evidence from not only Ms. Rios, but the attorney she interviewed with, Mr. Fogel, to demonstrate that an express agreement was reached not to discuss confidential information during the interview process. Ex. E at ¶ 7-8; Ex. B at ¶ 5. Implementing an ethical wall prior to interviewing would have no additional effect at F&R, as F&R does not discuss confidential information with interview candidates.[5]

LKQ instead relies on *Ullman v. Denco, Inc.*, which is plainly distinguishable on several grounds. Case No. 2:14-cv-00843 SMV/GBW, 2015 WL 11111287 (D.N.M. Apr. 22, 2015). Significantly, *Ullman* was pending in New Mexico, where attorney screening was only permitted if the attorney "does not possess confidential information or did not have a substantial role in the matter" at the prior firm – a completely different test than that provided in either the Model Rules or the Illinois Rules.[6] 2015 WL 11111287, at *3. In *Ullman*, the court first noted that the case was "early in the process" and that the defendants "presented no evidence of a long attorney-client relationship" with the law firm, and the risk for prejudice to the defendants was thus "less pronounced." *Id*. at *5. The court also determined the hiring law firm was "relatively small," consisting of just nine attorneys, and had "all attorneys and support staff . . . work[ing] in the same building." *Id*. at *6. Finally, the court in *Ullman* cited to the new employee's apparent desire to share information due to a lack of understanding of her ethical obligations. *Id*. at *6 n.6.

In sharp contrast, this case has been pending since November 2021 and reflects a longstanding attorney-client relationship between F&R and GM. GM would be significantly

---

[5] Moreover, such a process would almost certainly require the disclosure of information that would at that point still be confidential under Model Rule of Prof'l Conduct 1.6(a).
[6] As explained throughout, Illinois allows counsel to avoid disqualification solely by implementing an appropriate ethical wall.

prejudiced if it were to lose its counsel of choice.[7] "The Seventh Circuit has repeatedly admonished courts to guard against lightly disqualifying the attorney of a party's choice partly because of the prejudice inevitably resulting from such disqualification." *Kapco*, 637 F. Supp. at 1241. In *Kapco*, the plaintiff's motion to disqualify was denied where the challenged counsel had "been involved in [the] litigation from its inception at considerable expense to [the defendant]," and thus was "virtually indispensable" to the defendant's position in the litigation. *Id*. Unlike the *Ullman* court, "[t]he Seventh Circuit has also cautioned district courts to guard against the increasing use of disqualification motions in the arsenal of litigation tactics." *Id. See also RMB Fasteners, Ltd. v. Heads & Threads Intern., LLC*, Case No. 11 C 2071, 2012 WL 245124, at *2 (N.D. Ill. Jan. 25, 2012) (viewing motions to disqualify "with extreme caution for they can be misused as techniques of harassment") (internal citations and quotations omitted).

A more appropriate comparison is *Hayes v. Central States Orthopedic Specialists, Inc.* There, the Oklahoma Supreme Court reversed and remanded the lower court's decision to disqualify citing to the same concerns as Informal Opinion 88-1526 and holding "the hiring firm should be given the opportunity to prove that the non-lawyer has not revealed client confidences to the new employer and has been effectively counseled and screened from doing so." 51 P.3d 562, 570 (Okla. 2002). If the court is satisfied with the proof provided, then "the court should deny the motion to disqualify the non-lawyer's new firm." *Id. See also Kapco*, 637 F. Supp at 1241.

Also instructive is *Lamb v. Pralex Corp*., which was decided under the ABA Model Rules. 333. F. Supp. 2d 261 (D.V.I. 2004). There, the paralegal's former firm sought to disqualify the hiring firm, but the court found that "disqualification was not warranted." *Id*. at 366. This was

---

[7] This case is further distinguishable from *Ullman* in that Ms. Rios has not joined a small law firm where everyone works together in the same building. F&R employs nearly 400 attorneys across 15 different offices. See https://www.fr.com/. Ms. Rios has never set foot in F&R's Chicago office and has exclusively worked remotely since the time she was hired. Ex. B at ¶¶ 2, 3.

because the paralegal was advised upon disclosure of the conflicted cases that "she would be prohibited from and have no access to the electronic or physical files for those cases on which she would be conflicted." *Id.* The party seeking disqualification could not directly contradict the evidence of screening, and the Court held that "more is required before a court will be forced to relieve a litigant of his counsel of choice." *Id. See also Hodge v. URFA-Sexton, LP*, 758 S.E.2d 314, 323-24 (Ga. 2014) (screening procedure for former paralegal sufficient to avoid disqualification under Georgia's version of Rules 1.10 and 5.3, even where the hiring firm both failed to conduct a conflict check during hiring process and failed to implement the ethical wall until seven months into the paralegal's employment).

F&R's screening procedure and other preventative measures are perfectly in line with what is required by the ethical rules. No ethical violation occurred. F&R submits that the disqualification inquiry should end here and requests that LKQ's motion be denied.

## II.    Under the Traditional Test, F&R's Actions Rebut the Presumption of Shared Confidences with Respect to F&R's Representation in this Case.

Under the traditional Seventh Circuit test on disqualification, F&R clearly rebuts the presumption of shared confidences for the present representation through its comprehensive conflicts procedure and erection of the ethical wall. Ex. K at 8-9.

LKQ apparently believes that the very fact that Ms. Rios interviewed for a F&R job is impermissible, as LKQ levels a wholly unsupported allegation that confidential information was necessarily discussed during the interview process. That is simply not true, and F&R has submitted numerous declarations that establish just that. LKQ also conflates discussion of Ms. Rios's "experience at Irwin IP" in general with the impermissible discussion of client confidential information related to this case. ECF Dkt. No. 303 at 12. The record is clear – there is no evidence to suggest that Ms. Rios discussed anything confidential in her interviews with F&R.

Even the cases LKQ cites make clear that disqualification is inappropriate here. First, LKQ cites to *Hitachi, Ltd. v. Tatung Co.*, which involved an attorney in California where attorney screening was disallowed until 2018. 419 F. Supp. 2d 1158, 1160-61 (N.D. Cal. 2006). Because "the established law in California rejects ethical walls," the "ethical screening procedures [could] not prevent vicarious disqualification." *Id*. at 1164. This is clearly distinguishable both in law (Illinois allows ethical screening) and in fact (this case involves a paralegal).

LKQ's attempts to rely on *Coburn v. DaimlerChrysler Servs. N. Am., L.L.C.* are equally unavailing. 289 F. Supp. 2d 960, 964 (N.D. Ill. 2003). In that case, there was no evidence concerning any screening mechanisms in place, and the disqualified lawyer's testimony was contradicted by other testimony enough to "raise[] doubts" about the reliability of his representations concerning his communications with the other party's administrative assistant. *Id*. at 966-67. LKQ also relies on *Schiessle v. Stephens*, a case involving disqualification of attorneys where "no evidence exist[ed] in the record establishing that the [disqualified] firm ha[d] 'institutional mechanisms' in effect" to insulate the conflicted attorney from participation and information relating to the case. 717 F.2d 417, 421 (7th Cir. 1983).

Unlike these cases, F&R has presented voluminous uncontroverted testimony that no information was shared and has established the integrity of its ethical wall. F&R's precautions prevented any sharing of confidential information, which necessitates denial of LKQ's Motion.

## III.     LKQ Seeks Disqualification Based on Misleading and Untrue Factual Assertions.

Throughout its supporting memorandum, LKQ's counsel makes a variety of unfounded assertions against both F&R and Ms. Rios, whom it trusted as an "integral part" of the case team just two months ago. ECF Dkt. No. 303 at 2. Many of these allegations are fantastical, and several of them are nothing more than blatantly false smears that have no place in this Court.

First, LKQ alleges that F&R's Talent Acquisition Lead, Ms. Maloney desired to "lure" Ms.

Rios away from Irwin IP based on her "unique knowledge concerning this case and LKQ's confidential information and legal strategies." ECF Dkt. No. 303 at 2. This is false. Ms. Maloney had no prior knowledge of Ms. Rios's involvement in this case – she is a recruiter, not an attorney working on patent litigation matters. Ms. Maloney found Ms. Rios using a simple LinkedIn search for litigation paralegals in Chicago and using "IP" as the keyword. Ex. A at ¶ 6. Ms. Rios was not singled out based upon her work in this case or any other case. She was one out of over two dozen candidates that Ms. Maloney messaged to gauge interest in the position. Ex. A at ¶ 8. The steps taken by F&R in reaching out to Ms. Rios reflect a standard process for soliciting applications for a position based upon a candidate's experience and credentials. Ex. A at ¶ 16. Put simply, F&R reached out to Ms. Rios (and dozens of other candidates) because F&R had an open paralegal position and she was qualified for the job, not because she worked on this case at Irwin IP.

LKQ also notes that an F&R attorney on this case, Louis Fogel, interviewed Ms. Rios. ECF Dkt. No. 303 at 2. LKQ ignores Ms. Rios's sworn statement that at the start of that interview, "Mr. Fogel instructed [her] that [they] could not discuss the *GM/LKQ* matters." Ex. J at ¶ 12. Ms. Rios and Mr. Fogel both submitted sworn testimony that they never discussed this matter or any other client or case information during that 30-minute interview. *Id*. *See also* Ex. E at ¶ 8. That Mr. Fogel and Ms. Rios exchanged emails related to this case after the interview is of no consequence, as Ms. Rios sent those emails in her professional capacity and copied Irwin IP attorneys.

Next, LKQ asserts Ms. Rios never informed Irwin IP she was leaving for F&R and "refused" to conduct an exit interview. ECF Dkt. No. 302 at 2. Both contentions are irrelevant, and LKQ knows they are both untrue. Ms. Rios met with several colleagues during her final weeks at Irwin IP and told them she would be joining F&R. Ex. B at ¶ 15. Moreover, Irwin IP did not attempt to schedule an exit interview with Ms. Rios until **after** she had left. On February 13, 2025,

Lisa Holubar (using her Irwin IP email account) sent an email to Ms. Rios's personal Gmail account. Ex. B at ¶ 16. That email stated "I am so sorry to have not scheduled this sooner" before requesting Ms. Rios conduct an exit interview that following Tuesday, six days after her last day of employment. Ex. B at ¶ 17 and at Ex. 1. Ms. Rios opted not to conduct an exit interview on her own time, as she understood her exit to be amicable. Ex. B at ¶ 18. Had Irwin IP scheduled an exit interview before Ms. Rios's exit, she would have been happy to participate. Ex. B at ¶ 19.

Finally, LKQ makes numerous allegations regarding Ms. Rios's alleged email deletions before her last day at Irwin IP. ECF Dkt. No. 302 at 2; ECF Dkt. No. 303 at 4, 13. First and most importantly, this issue is irrelevant to the legal analysis of whether a disqualification motion should be granted. Ex. K at 8. Second, LKQ does not claim these emails were unrecoverable. Quite the opposite, LKQ provides an affidavit defining "deletion" only as removal from certain folders before providing precise detail concerning the number, senders, recipients, and contents of those emails. *See* ECF Dkt. No. 307, at ¶¶ 4-8. As expected, it appears Irwin IP recovered and reviewed the "deletions" from Ms. Rios's email account. Third, LKQ is silent on if (a) Ms. Rios archived the emails elsewhere or (b) it has identified any email "deleted" by Ms. Rios that was not also sent to another Irwin IP employee. Instead, LKQ casts aspersions at Ms. Rios that she was "engaged in harmful and unethical conduct and wanted to cover her tracks." ECF Dkt. No. 303 at 4.

In short, LKQ's repeated misstatements and misrepresentations should be seen for what they truly are – an attempt by LKQ's lawyers to simultaneously mislead this Court, smear their former colleague, and severely prejudice GM by depriving it of its chosen counsel.

WHEREFORE, for the reasons stated herein and in the accompanying opposition to LKQ's motion, Fish & Richardson P.C. respectfully requests this Court deny LKQ's motion and to grant such further relief as this Court deems just.

Dated: April 14, 2025          Respectfully submitted,

By:    /s/ Trisha M. Rich       
       Trisha M. Rich
       William A. Ringhofer
       Holland & Knight LLP
       150 N. Riverside Plaza, Suite 2700
       Chicago, IL 60606
       (312) 263-3600
       trisha.rich@hklaw.com
       william.ringhofer@hklaw.com

       *Attorneys for Respondent Fish &*
       *Richardson P.C.*